Case 1:23-cr-00142-JKB   Document 17   Filed 05/01/23   Page 1 of 12

JTW: 02.01.23



**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*
*Northern Division*

| | | | |
|---|---|---|---|
| *Kenneth S. Clark*<br>*Assistant United States Attorney*<br>*Kenneth.Clark@usdoj.gov* | *Mailing Address:*<br>*36 S. Charles Street, 4th Floor*<br>*Baltimore, MD 21201* | *Office Location:*<br>*36 S. Charles Street, 4th Floor*<br>*Baltimore, MD 21201* | *DIRECT: 410-209-4859*<br>*MAIN: 410-209-4800*<br>*FAX: 410-962-0717* |

April 24, 2023

✓ FILED  ___ ENTERED
___ LOGGED  ___ RECEIVED

4:23 pm, May 01 2023
AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ Deputy

**VIA U.S. MAIL AND EMAIL**

William Porter, Esq.

    Re:    United States v. Daniel Huezo Landaverde
           Criminal No. JKB-23-0142

Dear Counsel:

    This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Daniel Huezo Landaverde (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by May 15, 2023, it will be deemed withdrawn. The terms of the Agreement are as follows:

### Offense of Conviction

    1.    The Defendant agrees to plead guilty to Count One of a Criminal Information, which charges the Defendant with Conspiracy to Participate in a Racketeering Enterprise, in violation of 18 U.S.C. § 1962(d). The Defendant admits that the Defendant is, in fact, guilty of the offense and will so advise the Court.

### Elements of the Offense

    2.    The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

Count One (RICO Conspiracy): On or about the time alleged in the Information, in the District of Maryland, (1) an enterprise, MS-13, existed, consisting of a group of persons associated together for a common purpose of engaging in a course of conduct; (2) the Enterprise engaged in, or its activities in some way affected, interstate or foreign commerce; (3) the Defendant was associated with the Enterprise; (4) the Defendant knowingly and intentionally entered into an agreement that a conspirator would conduct, or participate in the conduct of, the affairs of the Enterprise through a pattern of racketeering activity; and (5) the Defendant agreed a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the Enterprise, including but not limited to, acts involving murder and conspiracy to

Rev. August 2018

commit murder, in violation of Maryland Code, Criminal Law § 2-201 and the Common Law of Maryland, and punishable pursuant to Maryland Code, Criminal Law § 1-202.

## Penalties

3. The maximum penalties provided by statute for the offense to which the Defendant is pleading guilty are as follows:

| Count | Statute | Minimum Prison | Maximum Prison | Supervised Release | Maximum Fine | Special Assessment |
|---|---|---|---|---|---|---|
| 1 | 18 U.S.C. § 1962(d) | 0 years | Life | Up to 5 years | $250,000 | $100 |

    a.    Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

    b.    Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

    c.    Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

    d.    Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

    e.    Forfeiture: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

    f.    Collection of Debts: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant

agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

## Waiver of Rights

4. The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

   a. If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

   b. If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

   c. If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

   d. The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

   e. If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

   f. By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be

admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

        g.     If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

        h.     By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

### Advisory Sentencing Guidelines Apply

5.     The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

### Factual and Advisory Guidelines Stipulation

6.     This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein.

        a.     Pursuant to U.S.S.G. § 2E1.1(b), the base offense level is the greater of offense level 19 or the offense level applicable to the underlying racketeering activity.

        b.     The parties agree and stipulate that pursuant to U.S.S.G. § 1B1.3, the underlying racketeering activities in this case involve acts, committed, aided, abetted, counseled, commanded, induced, or willfully caused by the Defendant, as well as all those acts reasonably foreseeable to him in furtherance of the jointly undertaken criminal enterprise, and include, among others: first-degree murder, in violation of Maryland Code Ann. Crim. Law §§ 2-201 and 2-204, conspiracy to distribute marijuana, in violation of 21 U.S.C. § 846, and interference with commerce by threats, in violation of 18 U.S.C. § 1951.

   c. This Office and the Defendant further agree that the base offense level for the offense of first-degree murder (related to Victim 20) is **43** pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2A1.1.

   d. This Office and the Defendant further agree that the base offense level for the offense of conspiracy to distribute marijuana is **12** pursuant to U.S.S.G. § 2D1.1(c)(14) to account for at least 5 kilograms of marijuana.

   e. This Office and the Defendant further agree that the base offense level for the offense of interference with commerce by threats is **18** pursuant to U.S.S.G. § 2B3.2(a). That is increased by **2** levels pursuant to U.S.S.G. § 2B3.2(b)(1) because the offense involved an express or implied threat of death or bodily injury.

   f. **Grouping**: Pursuant to U.S.S.G. § 2E1.1, application note one, the offense level for each predicate crime must be taken into account under the grouping rules contained in U.S.S.G. Chapter Three. The highest base offense level is forty-three (43). Pursuant to U.S.S.G. § 3D1.4, because the other offenses are more than 9 levels less serious, they do not increase the applicable offense level. As a result, the **combined offense level is forty-three (43)** for the offense of conspiracy to participate in a racketeering enterprise.

   g. This Office does not oppose a **2**-level reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a), based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional **1**-level decrease in recognition of the Defendant's timely notification of the Defendant's intention to enter a plea of guilty. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way. If the Defendant obtains a three-level reduction, **the final offense level for Count One will be 40**.

  7. There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

8. Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

## Waiver of Indictment

9. The Defendant understands that he has been accused of an offense punishable by imprisonment for more than one year and, as a result, has a right to be proceeded against by Indictment. After consultation with his attorney, he agrees to waive his right to prosecution by indictment and consent to prosecution by information and will complete a "Waiver of Indictment" form to that effect.

## Obligations of the Parties

10. At the time of sentencing, this Office and the Defendant reserve the right to advocate for a reasonable sentence, period of supervised release, and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a). This Office and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office or the Defendant deem relevant to sentencing, including the conduct that is the subject of any counts of the Indictment. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

## Waiver of Appeal

11. In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

   a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute(s) to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute(s), to the extent that such challenges legally can be waived.

   b. The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows:

   i. The Defendant reserves the right to appeal any sentence that exceeds the statutory maximum; and

          ii.      This Office reserves the right to appeal any sentence that is below a statutory minimum.

          c.      The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

### Defendant's Conduct Prior to Sentencing and Breach

12.    Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

13.    If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement; and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea if the Court finds that the Defendant breached the Agreement.

### Entire Agreement

14.    This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Erek L. Barron
United States Attorney

_____
Kenneth S. Clark
Anatoly Smolkin
Assistant United States Attorneys

I have read and/or have had read to me by a Spanish speaking interpreter this agreement and carefully reviewed every part of it with my attorney and an interpreter. I understand it, and I voluntarily agree to it. Specifically, I have reviewed and/or have had read to me by a Spanish speaking interpreter the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

4-24-23
_____
Date

_____
Daniel Huezo Landaverde

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

4-24-23
_____
Date

_____
William Porter, Esq.

Rev. August 2018

8

## ATTACHMENT A

## STIPULATION OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

*La Mara Salvatrucha*, also known as the MS-13 gang ("MS-13"), was a gang composed primarily of immigrants or descendants of immigrants from El Salvador, with members operating in the State of Maryland, including Montgomery County, Anne Arundel County, Prince George's County, and Frederick County, and throughout the United States. In the United States, MS-13 has been functioning since at least the 1980s. MS-13 originated in Los Angeles, California, where MS-13 members banded together for protection against the larger Mexican groups. MS-13 evolved into a gang that engaged in turf wars for the control of drug distribution locations. MS-13 quickly spread to states across the country, including Maryland. MS-13 was a national and international criminal organization and was one of the largest street gangs in the United States. Gang members actively recruited members, including juveniles, from communities with a large number of Salvadoran immigrants.

Members of MS-13 from time to time signified their membership by wearing tattoos reading "MARA SALVATRUCHA," "MS," "MS-13," or similar tattoos, often written in gothic lettering. Members also signified their membership through tattoos of devil horns in various places on their bodies. Members sometimes avoided conspicuous MS-13 tattoos, instead wearing discreet ones such as "503," spider webs, three dots in a triangle formation signifying "vida loca," or clown faces with phrases such as "laugh now, cry later." Some MS-13 members have chosen not to have tattoos at all, or to have them placed on areas such as the hairline where they can be easily covered, in order to conceal their gang affiliation from law enforcement.

The gang colors of MS-13 were blue, black, and white, and members often wore clothing, particularly sports jerseys, with the number "13," or with numbers that, when added together, totaled 13, such as "76." MS-13 members also wore blue and white clothing to represent their membership, including blue and white shoes such as the Nike "Cortez." As with tattoos, some MS-13 members selected more discreet ways of dressing in order to signify their membership and, at the same time, avoid detection by law enforcement.

MS-13 members referred to one another by their gang names, or monikers, and often did not know fellow gang members except by their gang names.

At all relevant times, members of MS-13 were expected to protect the name, reputation, and status of the gang from rival gang members and other persons. MS-13 members required that all individuals show respect and deference to the gang and its membership. To protect the gang and to enhance its reputation, MS-13 members were expected to use any means necessary to force respect from those who showed disrespect, including acts of intimidation and violence. MS-13

had mottos consistent with its rules, beliefs, expectations and reputation including "*mata, viola, controla*," which translates as, "kill, rape, control," and, "*ver oir y callar*," which means, "see nothing, hear nothing and say nothing."

At all relevant times, members and associates of MS-13 frequently engaged in criminal activity as defined in 18 U.S.C. § 1961(1), including, but not limited to, murder and extortion, and dealing in illegal controlled substances, as well as attempts and conspiracies to commit such offenses. These crimes and acts have been committed by MS-13 members in the District of Maryland within ten years of each other, and affected interstate commerce. MS-13 members were required to commit acts of violence both to maintain membership and discipline within the gang, as well as against rival gang members. Participation in criminal activity by a member, particularly in violent acts directed at rival gangs or as directed by gang leadership, increased the respect accorded to that member, resulted in that member maintaining or increasing his position in the gang, and opened the door to a promotion to a leadership position. One of the principal rules of MS-13 was that its members must attack and kill rivals whenever possible. Rivals were often referred to as "*chavalas*." MS-13, in the area of Anne Arundel County, Frederick County, Prince George's County and Montgomery County, Maryland, maintained rivalries with the 18th Street Gang, among others.

Prospective members who sought to join MS-13 were required to complete an initiation process. Individuals who associated and committed crimes with the gang, but were not prospective members, were called "paisas." Individuals who did favors and other acts for the gang were called "paros." Persons being observed by the gang for potential membership were known as "observations." Individuals who were attempting to join the gang were called "chequeos," or "cheqs." Chequeos underwent a probationary period during which they were required to commit crimes on behalf of MS-13 to achieve trust and prove their loyalty to the gang. To join MS-13 and become full members or "homeboys," prospective members were required to complete an initiation process, often referred to as being "jumped in" or "beat in" to the gang. During that initiation, other members of MS-13 would beat the new member, usually until a gang member finished counting aloud to the number thirteen, representing the "13" in MS-13.

MS-13 was an international criminal organization, and was organized in Maryland and elsewhere into "cliques," that is, smaller groups operating in a specific city or region. Cliques operated under the umbrella rules of MS-13. MS-13 cliques often worked together cooperatively to engage in criminal activity and to assist one another in avoiding detection by law enforcement. In Maryland and the surrounding area, these cliques included Fulton Locos Salvatruchas ("FLS"), Molinos Locos Salvatruchas ("Molinos"), Uniones Locos Salvatruchas ("Uniones"), Parkview Locos Salvatrucha ("PVLS"), Sailors Locos Salvatrucha Westside ("SLSW" or "Sailors), Normandie Locos Salvatrucha ("NLS" or "Normandie"), Langley Park Salvatrucha ("LPS"), and Weedoms Locos Salvatrucha ("Weedoms"), among others.

MS-13, including its leadership, membership, and associates, constituted an enterprise as defined in 18 U.S.C. §§ 1961(4) and 1959(b)(2), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce ("the Enterprise"). The Enterprise constituted an ongoing organization whose members functioned as a

continuing unit for a common purpose of achieving the objectives of the Enterprise. The purposes of the Enterprise include the following:

    a.    Preserving and protecting the power, territory, and profits of the Enterprise through the use of intimidation and violence, including assaults, murders, and threats of violence;

    b.    Promoting and enhancing the Enterprise and its members' and associates' activities;

    c.    Enriching the members and associates of the Enterprise through extortion and the sale of illegal controlled substances;

    d.    Keeping victims and potential witnesses in fear of the Enterprise and in fear of its members and associates through threats of violence and actual violence; and

    e.    Providing assistance to members and associates, in order to hinder, obstruct and prevent law enforcement officers from identifying offenders, apprehending offenders, and trying and punishing offenders.

From an unknown time but before in or about January 2020, the Defendant, DANIEL HUEZO LANDAVERDE, was a member or associate of the FLS clique of MS-13. The Defendant agreed with members of MS-13 to conduct and participate in the gang's affairs through a pattern of racketeering activity that included murder, conspiracy to commit murder and offenses involving extortion and drug distribution. The Defendant agrees that the "Overt Acts" in the Information represent an accurate sample of his activities in furtherance of the racketeering enterprise.

In order to raise money, MS-13 would regularly obtain and re-sell marijuana, a Schedule I controlled substance. As a part of that effort, gang leadership would obtain bulk quantities of marijuana, which would then be broken up into smaller packages and provided to lower-level gang members to sell. The proceeds from these sales would then be provided to gang leadership to assist with expenses. LANDAVERDE was a low-level member of the gang who would receive marijuana, sell it, and then provide the proceeds to gang leadership.

MS-13 would also extort area brothels and others in order to raise money. In order to do so, the gang threatened the victims with violence or death if they did not provide the requested money (commonly referred to as "rent"). This money was generally collected on a weekly basis by low-level gang members who then provided the money to gang leadership to assist with gang expenses. As a lower-level member of the gang, LANDAVERDE assisted in collecting extortion money from those businesses.

In or around May 2020, LANDAVERDE aided and abetted the first-degree murder of Victim 20, in violation of Maryland Code Ann. Crim. Law §§ 2-201 and 2-204. Another gang member, Carlos Andreas Orellana, had lived with Victim 20 in the area of Silver Spring, Maryland. In Spring 2020, Orellana left the apartment after not paying rent. Thereafter, Orellana and Victim 20 got into a dispute about money and property that was missing from the apartment. Victim 20

and others found Orellana at a park in Wheaton, Maryland and assaulted him because they believed that he had stolen property from Victim 20.

Following the assault, Orellana told other members of MS-13 about the assault. MS-13 members indicated that the gang would have to retaliate against Victim 20 to maintain its standing. Orellana and other gang members also believed that Victim 20 was associated with the rival 18th Street gang, which was another sufficient reason to kill him.

Over the course of several weeks leading up to the murder of Victim 20, MS-13 members conducted surveillance to determine when Victim 20 generally left the apartment. They also obtained guns to be used in the murder and met several times to discuss what role in the murder each participant would play.

The night of May 25, 2020, LANDAVERDE and other MS-13 gang members gathered in a park in Silver Spring, Maryland. During that meeting, gang leadership met with each gang member to discuss the plan to murder of Victim 20, which was to happen the morning of May 26, 2020. LANDAVERDE was to serve as a lookout nearby where the murder would occur.

On May 26, 2020, at approximately 7:05 a.m., two FLS MS-13 gang members approached Victim 20 as he left his apartment in Silver Spring, Maryland. They fired handguns at him repeatedly, hitting him eight times. He died as a result of the gun shots. On the morning of May 26, 2020, LANDAVERDE went to the area of a nearby fire station. (A video on LANDAVERDE's phone shows him near there shortly after the murder.)

The murder of Victim 20 was intended to maintain and increase the status of MS-13 and allow members of MS-13 to maintain or increase their status within the gang. The defendant committed the acts described herein unlawfully, knowingly, and willfully, and without legal justification or excuse with the specific intent to do that which the law forbids, and not by mistake, accident, or any other reason.

SO STIPULATED:

_____
Kenneth S. Clark
Anatoly Smolkin
Assistant United States Attorneys

_____
Daniel Huezo Landaverde
Defendant

_____
William Porter, Esq.
Counsel for Defendant

Rev. August 2018